{¶ 10} By April 1949, the Nationalists were losing. Mao's forces had reached the Yangtze River and were advancing upon Nanking. Their successes meant that the movement of neutral shipping was not under threat. In order to protect British interests, including the embassy at Nanking, the Royal Navy frigate Amethyst was ordered to sail for the Nationalist capital.
 {¶ 11} The Amethyst proceeded up the Yangtze on 19 April, navigated by Peter Berger (as he was then). But on 20 April, sixty miles from Nanking, she was crippled in a devastating attack. Shells hit gunnery control, the wheelhouse, and — twice — the bridge. Many, including the captain, were killed. The steering jammed and the ship ran aground. Berger himself suffered severe wounds to the chest, arm, and leg. But, in what became known as "the Yangtze Incident," Berger organized sailors to defend the ship while he destroyed its cipher machine and code books. Dosing himself on morphine, he and the First Lieutenant managed to get the Amethyst refloated and away from the Communist batteries. The Amethyst was saved: and Berger had a DSC.
 {¶ 12} One may safely conclude that Vice-Admiral Sir Peter Berger, KCB, LVO, DSC was a man of considerable courage with no pressing desire for the life of the armchair. After retiring from the Royal Navy in 1981, Berger was appointed Bursar of Selwyn College in Cambridge, an office he held with distinction for a further ten years. Yet his retirement, when it came, was two years early.
 {¶ 13} Why? Sir Peter had discovered that, as the law stands concerning food hygiene and health and safety, the College (and possibly its officers) was almost certain to be convicted if anything *Page 6 
went wrong in the College or its kitchens, and this was so irrespective whether anyone was actually at fault: it all turned, in effect, on whether the inspectors would exercise their discretion to prosecute. He said to his friends that, as an honourable man, he viewed being prosecuted and convicted for a criminal offence as something serious — and did not wish to be in the position where he might incur a conviction in respect of something for which he was not at fault."[5]
 {¶ 14} What does this story have to do with our case today? Everything. It shows the sheer unfairness of strict criminal liability. Making criminals of people with no criminal intent is fundamentally wrong. Criminals enough we have without manufacturing them wholesale by legislative conjuring.
 I. Unlicensed Dancing {¶ 15} Asina Valentine was arrested for performing an "exotic dance" without a license. She could have been locked up in jail for six months for this offense — and suffered the ignominy of a criminal conviction. Valentine moved to dismiss the charge because the statute did not specify a culpable mental state. The trial court refused, and Valentine pleaded no contest and was found guilty. Her attorney told the trial court that Valentine believed that her employer had obtained any necessary license.
 {¶ 16} Valentine now appeals her conviction. The city of Cincinnati claims that the ordinance requiring a license imposes "strict liability," which means that the defendant is guilty without proof of any intent to violate the law. Even innocent *Page 7 
people are guilty. Of course the ordinance requires proof of the mental state of recklessness. We should reverse on that basis, and for at least two other reasons.
 II. The Sting {¶ 17} Valentine worked for a company named Naughty Bodies. Valentine's employer sent her to a downtown hotel to perform an exotic dance for a group of men who she later discovered were undercover police officers. After Valentine performed her dance, the officers arrested her because she could not produce a license. Her dance was not alleged to be obscene, and thus she was engaged in conduct legal in every way except that she lacked paperwork. Her employer was not charged.
 {¶ 18} Valentine was charged with violating Cincinnati Municipal Code 899-5(b), which states, "[I]t shall be unlawful for any person to be an employee of a sexually oriented business in the city of Cincinnati without a valid license."
 {¶ 19} In her sole assignment of error, Valentine argues that the trial court erred by finding her guilty of violating the ordinance because it contained no culpable mental state and by not requiring the state to allege and prove recklessness.
 III. Strict-Liability Crimes {¶ 20} A culpable mental state, or mens rea, is generally an essential element of a criminal offense.[6] Ordinarily, "an evil deed, without more, does not constitute a crime; a crime is committed only if the evil doer harbored an evil mind."[7] Thus, crimes include both the prohibited conduct and an intent by the actor to carry out the *Page 8 
prohibited conduct. Unless the act and the intent are both present, there is a risk that an innocent person or someone who has acted inadvertently will be labeled a criminal.
 {¶ 21} A strict-liability statute eliminates the requirement of an intent to commit the crime.[8] So defendants may be guilty of strict-liability crimes even if they have no intent to violate a law.
 {¶ 22} Strict-liability offenses were unknown at common law. The criminal law was assumed to regulate intentional conduct. Blackstone wrote that "an unwarrantable act without a vicious will is no crime at all. So that to constitute a crime against human laws, there must be, first, a vicious will; and, secondly, an unlawful act consequent upon such vicious will."[9] As Holmes wrote, "even a dog distinguishes between being stumbled over and being kicked."[10]
 {¶ 23} The United States Supreme Court has historically been leery of strict-liability offenses. Justice Jackson explained why: "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."[11]
 {¶ 24} Thus strict liability is generally disfavored in our penal system.[12] It is rightly disfavored — if a defendant is truly blameless, then punishment for the offense does not deter further offenses, does not offer retribution for the offense, and labels *Page 9 
innocent people as criminals.[13] Commentators have recognized that strict-liability crimes do not deter wrongful behavior — even if the defendant uses the utmost care, a court will not excuse a violation. Further, strict liability cannot be used as retribution because, under strict liability, the offender need not be at fault. Finally, commentators note that imposing strict liability degrades criminal sanctions because blameless people are labeled as criminals, and that even if strict criminal liability is imposed for the sake of efficiency, incarceration should never attach.[14]
 {¶ 25} The Model Penal Code, a statutory text developed by the American Law Institute to standardize the penal law in our country, only allows the imposition of strict liability for "violations" rather than crimes — and only for actions punishable by civil penalties like fines, but not for actions punishable by imprisonment.[15] The "violation" standard avoids using the hatchet of the criminal law to accomplish a regulatory goal. When the criminal sanctions — incarceration and the shame, ignominy, and future disabilities (imagine listing this "conviction" in a job application) — are removed, strict liability may apply.
 {¶ 26} If this were a non-criminal violation, carrying no possibility of incarceration, there would be no problem. But we tend to use the criminal law as a bludgeon in so many instances where it does not belong.
 {¶ 27} Valentine was accused of violating Cincinnati Municipal Code 899-5(b), a first-degree misdemeanor. The crime was punishable by a fine of up to $500 *Page 10 
and by confinement for up to 180 days.[16] (For some reason, the ordinance has a lower fine than most first-degree misdemeanors — though the same jail time.)
 {¶ 28} Valentine could have been sentenced to six months of jail time for lacking a license her employer should have procured to allow her to perform an activity protected by the First Amendment. Just to state it that way shows how wrong it would be to impose strict liability. The majority avoids this issue by essentially punting — and somehow stating that Valentine did not appeal this issue. In fact, it is the only thing she appealed.
 IV. First Amendment Considerations {¶ 29} The United States Supreme Court has stated that nude dancing is expressive conduct that falls under the protection of the First Amendment.[17] And the federal Sixth Circuit Court of Appeals has held that exotic dancing that takes place in private settings, such as the hotel room at issue in this case, is "expression protected by the First Amendment."[18]
 {¶ 30} Several United States Supreme Court cases have held that when a form of expression protected by the First Amendment can be made illegal by some element of that expression, a law attaching strict liability is unconstitutional.[19] For example, in Smith v. California,[20] a bookstore owner was convicted of violating a city ordinance that made him strictly liable for possessing an obscene book in his store. It did not *Page 11 
matter that the owner did not know the contents of the book. Even though obscene material was not protected by the First Amendment, the Court held that because the ordinance might restrict the public's access to constitutionally-protected material, the ordinance had to have a mens rea requirement. (Valentine's exotic dance was not alleged to be obscene and her dance was protected under the First Amendment.)
 {¶ 31} In this case, the city was entitled to require Valentine to have a license.[21] But imposing strict liability for an offense that implicates the First Amendment crosses the line between regulating an activity and "inhibiting] the ability or the inclination to engage in the protected expression."[22]
 {¶ 32} Just two months ago, the United States Court of Appeals for the District of Columbia Circuit reaffirmed that "[s]trict liability is generally disfavored in criminal law, particularly with respect to cases that implicate the First Amendment."[23]
 V. Strict or Reckless {¶ 33} The city argues that strict liability was properly imposed. Valentine argues that the statute did not contain a clear intention to impose strict liability and thus that the city had to prove recklessness. Even if the city could impose strict liability at all — and even if it could impose strict liability on an activity that is protected by the First Amendment — both of which I doubt — the ordinance does not express a clear intent to impose strict liability. "Thus, when a legislature wants to eliminate intent as an element of a particular crime, it should expressly so state in the statute."[24] The ordinance fails for this reason also. *Page 12 
 {¶ 34} Cincinnati Municipal Code 902-11(b), which is identical to R.C.2901.21(B), states that when an ordinance neither specifies a degree of culpability nor "plainly indicates" a purpose to impose strict liability for the conduct, recklessness is sufficient culpability to commit the offense. And the Ohio Supreme Court has held that it is not enough for lawmakers to have intended to impose strict liability. Instead, the language of the statute must clearly impose strict liability.[25]
Strict liability is so disfavored that we should not endorse it unless absolutely compelled to do so.
 {¶ 35} The Ohio Supreme Court has interpreted several statutes as requiring a culpable mental state. Examples are prostitution,[26]
contributing to the unruliness of a child,[27] failure to pay child support,[28] child endangering,[29] and embezzling or misapplying building and loan funds.[30]
 {¶ 36} Likewise, this court has interpreted certain statutes and ordinances as requiring a culpable mental state, such as performing home improvements in excess of $500 without a contract[31] and operating a cemetery without an endowment care trust.[32]
 {¶ 37} Other statutes, or elements of statutes, have been interpreted as imposing strict liability. Examples include bringing child pornography into the state,[33] possessing or having under one's control a deadly weapon during a theft or *Page 13 
while fleeing from a theft,[34] driving a vehicle under the influence of alcohol,[35] and gambling and operating a gambling house.[36]
 {¶ 38} The Ohio Supreme Court cases where the court determined that strict liability should be imposed even though the statute did not specify a degree of culpability can be divided into three general categories: (1) statutes with differing mens rea requirements; (2) statutes with federal counterparts that indicate strict liability; and (3) statutes that are necessary for public safety.
 {¶ 39} A crime may have different degrees of mental states for different elements.[37] In State v. Wac, the statute prohibited a person from "engaging] in bookmaking, or knowingly engaging] in conduct that facilitates bookmaking." The court determined that because the statute did not contain the "knowingly" requirement in the first clause, this differentiation clearly indicated the legislature's purpose to impose strict liability.[38] The Ohio Supreme Court has citedWac in other cases for the proposition that when one part of the statute explicitly states a degree of mental culpability and the other is silent, strict liability should be imposed for the silent clause.[39]
This logic, though questionable at best, does not apply to the ordinance here.
 {¶ 40} The second type of statute was at issue in State v.Schlosser.[40] The defendant was arrested for engaging in a pattern of corrupt activity[41] under the Ohio Racketeer Influenced and Corrupt Organizations Act (RICO). The Ohio RICO statute *Page 14 
is based on the federal RICO statute.[42] The Schlosser court noted that federal courts had determined that the federal RICO statute did not require any specific intent and had considered the purpose behind the federal law.[43] The court determined that due to public-safety concerns and legislative history, and because strict liability had been read into the federal counterpart, and the statute contained varying degrees of mental states, it was appropriate to impose strict liability. And the RICO statute is predicated on the accused committing underlying criminal acts that require criminal intent — so the additional element is not even truly strict liability.
 {¶ 41} A third category of statutes that impose strict liability on defendants involve mala prohibita offenses. The Ohio Supreme Court defined mala prohibita offenses in Schlosser: "acts [that] are made unlawful for the good of the public welfare regardless of the state of mind."[44] In Schlosser, the mala prohibita offense was engaging in a pattern of corrupt activity. Other examples are driving under the influence of alcohol or running a stop sign.[45] This type of strict-liability consideration is where courts are most likely to go wrong. Of course, minor traffic offenses bring no possibility of jail, and it is difficult to conjure a case where driving drunk would not be reckless. And if someone were forced at gunpoint to drive after drinking, would they be convicted anyway? If not, then the strict-liability analysis breaks down — and rightly so. *Page 15 
 VI. Even if Strict Liability Were Proper — Which It Is Not — This Ordinance Shows No Intent to Impose Strict Liability {¶ 42} We should hold that Cincinnati Municipal Code 899-5 does not clearly indicate an intent to impose strict liability. It does not say so — and we should not read words into an ordinance.
 {¶ 43} The Cincinnati Municipal Code mandates that we construe the code strictly against the city and liberally in favor of Valentine.[46] The ordinance at issue here states that "it shall be unlawful for any person to be an employee of a sexually oriented business in the city of Cincinnati without a valid license."[47] The Ohio Supreme Court has determined that language stating "no person shall" is not enough to indicate an intention to impose strict liability.[48] Likewise, "it shall be unlawful" does not mean that the ordinance imposes strict liability. Almost every criminal statute or ordinance starts with "no person shall," "it shall be unlawful," or the like.
 {¶ 44} The city ordinance does not belong in any of the three categories of language that have prompted the Ohio Supreme Court to endorse strict liability. The first two categories do not merit discussion: Cincinnati Municipal Code 899-5 does not contain differing degrees of mental culpability, and the ordinance is not based on a federal statute.
 {¶ 45} As for the third category, this city ordinance does not rise to the level of creating a mala prohibita offense as defined by the Ohio Supreme Court — "acts [that] are made unlawful for the good of the public welfare regardless of the state of mind."[49] *Page 16 
The kinds of statutes that the Ohio Supreme Court and this court have recognized to impose strict liability involve prohibiting drunk driving[50] or running a stop sign.[51]
 {¶ 46} But the Ohio Supreme Court has refused to endorse strict liability for statutes that define the offense of prostitution,[52]
contributing to the unruliness of a child,[53] and failure to pay child support.[54] The court has stated that it cannot recognize strict liability solely based on public-policy considerations because that would be adding language not found in the statute.[55]
 {¶ 47} The ordinance at issue in Valentine's case — requiring a license to perform an exotic dance — is not what the Ohio Supreme Court had in mind when it defined mala prohibita offenses as those making it "unlawful for the good of the public." No reasonable person could imagine that requiring an exotic dancer to be licensed would protect the public more than prohibiting child endangerment or prostitution. Yet the Ohio Supreme Court has refused to endorse strict liability for laws prohibiting child endangering, failing to pay child support, or prostitution.
 VII. Majority Ignores Recent Precedent {¶ 48} In view of this court's history of construing strict liability, it becomes even more obvious that Valentine could not have been held to strict liability. In State v. Shugars,[56] the defendant was hired to build a carport and a deck. He took $9,000 from the customer who had hired him, but he did not perform most of the work. He was charged with performing home improvements in excess of $500 without a *Page 17 
contract (Cincinnati Municipal Code 891.3). The city argued that this was a strict-liability offense. But this court noted that public-policy arguments and mandatory language did not factor into the determination whether to recognize strict liability. The majority ignores this court's recent precedent.
 {¶ 49} Valentine's case, like Shugars, involves an underlying activity that is perfectly legal. Performing home improvements is legal in Cincinnati, as long as the contractor has a contract. Likewise, performing an exotic dance is a legal activity, as long as the dancer or her employer has a license to do so. Like the ordinance inShugars, the exotic-dancing ordinance does not clearly indicate an intent to impose strict liability.
 {¶ 50} Being held criminally liable for failing to produce a license and being held criminally liable for failing to produce a contract before beginning one's work involve similar concepts. The logic ofShugars applies equally to this case. Here, we even have the additional First Amendment consideration that militates against strict liability.
 {¶ 51} Making criminals of those who do not have a criminal intent flies in the face of common sense, fundamental fairness, and the purpose of the criminal law.[57] Interestingly, the majority states that this court has "rejected" that statement. It has in a case where a person was wrongly convicted for serving a minor, having relied on a stamp that another employee, who was responsible for checking ages, had applied mistakenly. I said then, and reiterate now, that "this district has been consistently wrong for many years [on that issue], with untold hundreds of innocent and hardworking men and women suffering the consequences. While we could never make up for the decades of mistreatment of our citizens, we should now stop this egregious misapplication of the law."[58] That was ten years ago, and the folly continues. *Page 18 
 {¶ 52} In construing the Cincinnati Municipal Code strictly against the city, as we must,[59] we should hold that Cincinnati Municipal Code 899-5(b) does not impose strict liability. To refuse to so hold only punts the issue to another day.
 VIII. Recklessness Missing {¶ 53} Cincinnati's code mirrors R.C. 2901.21(B), which states that if a statute does not specify or clearly indicate an intent to impose strict liability, the state must prove a mental state of recklessness. R.C. 2901.22 defines recklessness in this manner: "with heedless indifference to the consequences, [the defendant] perversely disregards a known risk that [the] conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, [the defendant] perversely disregards a known risk that such circumstances are likely to exist."
 {¶ 54} Recklessness is the lowest standard — except for criminal negligence — under which criminal liability may be imposed.
 {¶ 55} In Shugars, the state failed to allege recklessness in the complaint in its explanation of the circumstances of the offense, or during trial. Thus, this court overturned the defendant's conviction.
 {¶ 56} The state's actions were identical in this case. The state did not allege that Valentine had acted recklessly. (If the state had alleged recklessness, the trial court could have decided at trial whether Valentine's actions were reckless — was it reckless to rely on the employer to procure the necessary license?) Because the state did not allege or prove recklessness, we should reverse Valentine's conviction on that basis. *Page 19 
 {¶ 57} Moreover, by omitting an essential element, the complaint against Valentine failed to state an offense under Ohio law. This defect has affected Valentine's substantial rights. Because the charging instrument did not charge an offense, the trial court had no jurisdiction to try Valentine in the first place.[60]
 IX. And Did the Ordinance Even Apply? {¶ 58} In parsing the ordinance, I note that Valentine's actions might not even be covered at all. Valentine was charged with violating Cincinnati Municipal Code 899-5(b): "it shall be unlawful for any person to be an employee of a sexually oriented business in the city of Cincinnati without a valid license." The specific charge was that Valentine "was unlawfully employed by a sexual [sic] oriented business in the city of Cincinnati without having a valid license."
 {¶ 59} Cincinnati Municipal Code 899-1-E defines employee thusly: "Employ, Employee, and Employment. Describing and pertaining to any person who performs any service on the premises of a sexually orientedbusiness, on a full time, part time or contract basis, whether or not the person is denominated an employee, independent contractor, agent, or otherwise." (Emphasis added.) Valentine was not on her employer's "premises"; she was at a hotel. How did she violate the ordinance under the city's own definition?
 {¶ 60} Further, Cincinnati Municipal Code 899-1 says, "For purposes of this chapter, the words and phrases defined in the sections hereunder shall have the meanings therein respectively ascribed to them unless a different meaning is clearly indicated by the context." This passage seems, on first reading, to be in the English *Page 20 
language. But it must not be, unless it is an English from a parallel universe. It loosely translates into "words mean what they do, unless they don't." (" `When I use a word,' Humpty Dumpty said, in a rather scornful tone, `it means just what I choose it to mean, neither more nor less.' "[61]) We should take the city's definition of "employee" as it reads.
 {¶ 61} Cincinnati Municipal Code 899-5(b) could have one of two meanings. First, it may prohibit a person from being an employee of an unlicensed business. Second, it may require an employee of a sexually-oriented business to have a license. (Or it could require the city to have a valid license, but I assume that was not the intent.) Either way, the record only reflects that Valentine performed her dance in a hotel room. Unless Naughty Bodies operated out of that hotel room, she did not perform any service on the premises of a sexually-oriented business. Under the code, Valentine was not even an employee. Thus, even if the state could have proved that Valentine had acted recklessly, her behavior was not prohibited under the code.
 X. We Should Reverse for All Reasons {¶ 62} We should reverse Valentine's conviction for all of the foregoing reasons, rather than duck the issue. We should send the message that strict-liability offenses are anathema to the criminal law. A criminal law that allows for conviction of innocent people is, on its face, repugnant.
[5] Simester, Appraising Strict Liability (2005) vii.; See, also, http://www.telegraph.co.uk/news/main.jhtml?xml=/ news/2003/10/28/db2802.xml;http://www.geocities.com/rnships/amethyst.htm;http://www.imdb.com/title/tt0051209.
[6] Garnett v. State (1993), 332 Md. 571, 595, 632 A.2d 797; see, also, Wharton's Criminal Law (15 Ed.1993) 164-165, Section 27;Morissette v. United States (1952), 342 U.S. 246, 251-52,72 S.Ct. 240.
[7] Wharton's Criminal Law, supra, at 164.
[8] Staples v. United States (1994), 511 U.S. 600, 114 S.Ct. 1793, fn. 3.
[9] 4 Blackstone, Commentaries (1765 — 1769) 21.
[10] Holmes, The Common Law (1881) 3.
[11] Morissette v. United States (1952), 342 U.S. 246, 250,72 S.Ct. 240.
[12] American-Arab Anti-Discrimination Commission. v. City ofDearborn (C.A.6, 2005), 418 F.3d 600, 610.
[13] See, e.g., State v. Williams (Jan. 2, 1991), 2nd Dist. No. 11857;State v. McGee (1984), 12 Ohio Misc.2d 18, 468 N.E.2d 400.
[14] See, e.g., State v. Williams, supra, quoting State v.McGhee, supra; Packer, The Limits of the Criminal Sanction (1968) 121-131; Hart, The Aims of the Criminal Law (1958) 23; LaFave Scott, Criminal Law (1972) 218-223, Section 31; LaFave, Criminal Law (4 Ed.2003) 280; Hall, General Principles of Criminal Law (2 Ed.1960) 336-342.
[15] Model Penal Code 2.05.
[16] Cincinnati Municipal Code 801-99.
[17] City of Erie v. Pap's A.M. (2000), 529 U.S. 277, 289,120 S.Ct. 1382.
[18] Currence v. City of Cincinnati (C.A.6, 2002), 28 Fed.Appx. 438, 444.
[19] See Michaels, Constitutional Innocence (1999), 112 Harv.L.Rev. 828, 867-873; Smith v. California, (1959), 361 U.S. 147, 80 S.Ct. 215;United States v. X-Citement Video, Inc. (1994), 513 U.S. 64,115 S.Ct. 464; New York v. Ferber (1982), 458 U.S. 747, 102 S.Ct. 3348;Hamling v. United States (1974), 418 U.S. 87, 94 S.Ct. 2887.
[20] Smith, supra.
[21] See, e.g., Monroe v. WFO Corp., 12th Dist. No. CA2004-03-032,2005-Ohio-1080.
[22] Kev, Inc. v. Kitsap County (C.A.9, 1986), 793 F.2d 1053,1059.
[23] United States v. Sheehan (C.A.D.C.2008), 512 F.3d 621.
[24] Garnett, supra, at 597.
[25] State v. Collins, 89 Ohio St.3d 524, 530, 2000-Ohio-231,733 N.E.2d 1118.
[26] R.C. 2907.25; State v. Parrish (1984), 12 Ohio St.3d 123,465 N.E.2d 873.
[27] R.C. 2919.24; State v. Moody, 104 Ohio St.3d 244, 2004-Ohio-6395,819 N.E.2d 268.
[28] R.C. 2919.21(B); State v. Collins, supra.
[29] R.C. 2919.22(A); State v. McGee, 79 Ohio St.3d 193,1997-Ohio-156, 680 N.E.2d 975.
[30] Former R.C. 1153.01; State v. Warner (1990), 55 Ohio St.3d 31,564 N.E.2d 18.
[31] Cincinnati Municipal Code 891.3; State v. Shugars,165 Ohio App.3d 379, 2006-Ohio-718, 846 N.E.2d 592.
[32] R.C. 1721.21; State v. Merkle, 1st Dist. Nos. C-020454 and C-030557, 2004-Ohio-1913.
[33] R.C. 2907.321(A)(6); State v. Maxwell, 95 Ohio St.3d 254,2002-Ohio-2121, 767 N.E.2d 242.
[34] R.C. 2911.02(A)(1); State v. Wharf, 86 Ohio St.3d 375,1999-Ohio-112, 715 N.E.2d 172.
[35] R.C. 4511.19(A)(1); State v. Cleary (1986), 22 Ohio St.3d 198,490 N.E.2d 574.
[36] R.C. 2915.02 and 2915.03; State v. Wac (1981), 68 Ohio St.2d 84,428 N.E.2d 428.
[37] Maxwell, supra, at ¶ 30.
[38] Wac, supra, at 86.
[39] See, e.g., Maxwell, supra, at ¶ 30; State v. Lozier,101 Ohio St.3d 161, 2004-Ohio-732, 803 N.E.2d 770, at ¶ 40.
[40] (1997), 79 Ohio St.3d 329, 681 N.E.2d 911.
[41] R.C. 2923.32(A)(1).
[42] Section 1962, Title 18, U.S.Code.
[43] Id. at 332, citing United States v. Scotto (C.A.2, 1980),641 F.2d 47, 55-56.
[44] Id. at 333.
[45] State v. Tanner (1984), 15 Ohio St.3d 1, 472 N.E.2d 689, fn 4.
[46] Cincinnati Municipal Code 902-3.
[47] Cincinnati Municipal Code 899-5(b).
[48] State v. Moody, 104 Ohio St.3d 244, 2004-Ohio-6395,819 N.E.2d 268, at ¶ 16.
[49] Schlosser, supra, at 333.
[50] State v. Tanner, supra.
[51] Id. at fn. 4.
[52] State v. Parrish (1984), 12 Ohio St.3d 123, 465 N.E.2d 873.
[53] State v. Moody, 104 Ohio St.3d 244, 2004-Ohio-6395,819 N.E.2d 268.
[54] Collins, supra.
[55] Id. at 530.
[56] 165 Ohio App.3d 379, 2006-Ohio-718, 846 N.E.2d 592.
[57] State v. Chumbley (1998), 128 Ohio App.3d 323, 714 N.E.2d 968
(Painter, J., dissenting).
[58] Id.
[59] Cincinnati Municipal Code 902-3.
[60] Shugars, supra, at ¶ 17.
[61] Lewis Carroll, Through the Looking Glass (Easton Ed.1969), 112. *Page 1